**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **PHILIP DELPALAZZO**,<br><br>    Plaintiff,<br><br>    v.<br><br>**HORIZON GROUP HOLDING, LLC,**<br><br>    Defendant. | **CIVIL ACTION**<br><br>**NO. 19-5682-KSM** |

**MEMORANDUM**

**Marston, J.**                                                                                                                                **March 28, 2022**

Plaintiff Philip DelPalazzo claims his former employer, Defendant Horizon Group Holdings, LLC, violated the public policy exception to Delaware's at will employment doctrine when the company forced him to resign after he complained about fraudulent practices by other employees. (*See generally* Doc. No. 21.) Horizon moves for summary judgment, arguing that as a sales representative, DelPalazzo had no responsibility for ensuring that the company complied with the applicable consumer protection laws, and therefore, he cannot take advantage of the public policy exception.

## I. FACTUAL BACKGROUND

Philip DelPalazzo began working at Horizon in August 2011 as a sales representative. (D. Ex. A at 28:1–4 ("DelPalazzo Depo."); *see also* D. Ex. C at Ex. A (sales representative job description signed by DelPalazzo in November 2011).) As a sales representative, DelPalazzo sold HVAC systems for residential use, meeting with customers as directed by the company and negotiating prices within the parameters set by his superiors. (DelPalazzo Depo. at 28:8–20, 59:21–60:19; 216:5–219:24 (discussing essential functions of sales representative position) ; *see*

*also* D. Ex. C at ¶ 9 ("Koltz Decl.") ("Horizon sales representatives work to develop existing and prospective customers, to promote the sale of heating, cooling, plumbing, and electrical products and services for Horizon, and call on prospective and current customers of Horizon."); *id.* at Ex. A (sales representative job description).)  DelPalazzo did not manage or supervise any Horizon employees.  (*See* DelPalazzo Depo. at 208:1–3 ("Q: Did any people at the company report to you?  A: No."); *id.* at 216:1–4 ("Q: You did not supervise anyone, no one reported to you?  A: Yes, that is correct.")).

### A.   *Suspicious Leads from Technicians*

As a sales representative, DelPalazzo relied on "sales leads" to find customers.  (P. Ex. 1 at ¶ 11 ("DelPalazzo Decl.").)  A "sales lead" refers to "a person or business who may become a client."  (*Id.* at ¶ 12.)  Horizon's service technicians generated most of the company's "leads" by scheduling follow up appointments at which Horizon sales representatives would encourage customers to purchase a new unit instead of repairing an old one.  (DelPalazzo Depo. at 114:3–8; D. Ex. B at 20:1–14 ("V. DelPalazzo Depo.") ("So a lead is anything when you . . . schedule an appointment for a sales representative to come out to the house and give an estimate.").)

In 2017, DelPalazzo grew suspicious that some of Horizon's technicians were not being honest with customers about the extent to which their HVAC units needed repairs.  For example, in 2017 or 2018, a technician reported that a customer's air conditioner compressor had failed, and DelPalazzo sold her a new unit for $22,000.  (DelPalazzo Depo. at 118:1–19.)  But when a different technician came to install the new unit, DelPalazzo learned that the initial technician had incorrectly reported the problem, and the actual problem with the old unit was a $15 breaker switch.  (*Id.*)  During his deposition, DelPalazzo also recounted how one technician told him that there were "a lot of calls that [the technician] would go on to inflate the repair costs because it

was a ten-year older unit." (*Id*. at 125:9–17.) And during one sales call in 2018, DelPalazzo spoke with a customer who said the Horizon technician had sprayed oil by her furnace to make it look like it needed to be replaced when it did not. (*Id*. at 128:6–129:15.)

In December 2018, DelPalazzo's son, Vincent DelPalazzo, joined Horizon as a maintenance technician and over the first half of 2019, Vincent confirmed many of DelPalazzo's suspicions. (DelPalazzo Decl. at ¶¶ 17–18.) Among other things, Vincent told his father that other technicians had encouraged him to "inflat[e] repair costs, so that a homeowner would have to replace their unit or at least look into replacing their unit[.] [T]hey were told that if it is a ten-year old unit and you don't set a lead that you are going to be punished . . . ." (DelPalazzo Depo. at 108:15–109:23.) DelPalazzo and Vincent complained to Vincent's manager about these practices, but it is unclear from the record what, if any, steps Horizon took in response to their concerns. (DelPalazzo Decl. at ¶¶ 19–20.) And in May 2019, following their complaints, Horizon transferred Vincent to its installation department. (*Id.* at ¶ 21.)

### B.     *Pricing Differences*

Around the same time, in June 2019, DelPalazzo noticed that his new sales manager at Horizon, Adli Alami, was giving him fewer leads than he had received in previous months, and as a result, DelPalazzo generated substantially less revenue that month than he had the month before. (*See* DelPalazzo Decl. at ¶ 26.) DelPalazzo spoke with Alami, about his concerns, and Alami told him that "he was giving sales leads to other sales consultants in [the] department" because those sales representatives were able to close a greater quantity of sales by offering substantial discounts to customers on each sale. (*Id.*) DelPalazzo explained that he "could not discount more than 10% because of [his] contract with Horizon." (*Id.*) But Alami responded that "he did not care what the contract said" and was focused on producing the highest number of

3

sales possible. (*Id*.) During his deposition, DelPalazzo testified that he considered it "wrong" to sell the same product to different customers at grossly different prices. (DelPalazzo Depo. at 57:25–59:10.)

DelPalazzo also spoke with Alami about his concern that technicians were inflating repair costs to get customers to buy new units that they did not need, but Alami told DelPalazzo that the practice was "coming from upper management." (DelPalazzo Decl. at ¶ 28.) DelPalazzo had a nearly identical meeting with Alami on July 9, 2019, but again, Alami told him that the practices were "coming from upper management." (*Id*.)

### C. *DelPalazzo's Forced Resignation*

Disappointed with Alami's response, DelPalazzo took his complaints to Horizon's Human Resources ("HR") department, meeting with an HR representative on July 9. (*Id.* at ¶ 31.) Shortly after meeting with HR, DelPalazzo received a text message from Horizon's Vice President of Sales stating he had learned of DelPalazzo's complaints and asking whether DelPalazzo was available to meet the following morning. (*Id.* at ¶ 32.) DelPalazzo agreed, and when he arrived for the meeting the next day, he was met by not only the Vice President of Sales, but also a representative from HR and DelPalazzo's previous sales manager. (*Id.* at ¶ 34.) There was no discussion of DelPalazzo's HR complaint; instead, the three individuals immediately forced him to resign. (*Id.* at ¶¶ 34–36 (explaining that the Vice President told him, "We will accept your resignation effective today," and slid a resignation letter across the table for DelPalazzo to sign).)

## II. PROCEDURAL HISTORY

In October 2019, DelPalazzo filed this lawsuit against Horizon. The operative complaint is DelPalazzo's Second Amended Complaint. (*See* Doc. No. 21.) The only count remaining is

Count I, which asserts a cause of action for violations of the public policy exception to Delaware's at will employment doctrine. (*Id.* at ¶¶ 58–66.) Horizon has moved for summary judgment on this count. (*See* Doc. No. 57.)

## III. LEGAL STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23 (quotation marks omitted).

## IV. DISCUSSION

This Court previously found that DelPalazzo was an at will employee while working at Horizon. (*See* Doc. No. 16 at p. 8 ("DelPalazzo was an at will employee because the employment agreement did not create a fixed term of employment.").) In Delaware,[1] the scope of the at will employment doctrine is broad and "generally permits the dismissal of employees without cause and regardless of motive." *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 437 (Del. 1996). "But the doctrine is not entirely unfettered, and courts have demonstrated a willingness to impose constraints on an expansive interpretation of employers' prerogatives

---

[1] The parties agree that Delaware law governs this dispute.

under at will employment contracts." *Paolella v. Browning-Ferris, Inc.*, 158 F.3d 183, 190 (3d Cir. 1998) (quotation marks and alterations omitted). To this end, Delaware courts have recognized "a limited implied covenant of good faith and fair dealing as an exception to the harshness of the employment at-will doctrine." *Lord v. Souder*, 748 A.2d 393, 400 (Del. 2000).

There are four categories of actionable claims for violation of the covenant, including a claim that "the termination violated public policy." *Id.*; *see also Schuster v. Derocili*, 775 A.2d 1029, 1035 (Del. 2001). To state a claim under the public policy exception, an employee must show that he was fired for engaging in conduct that implicates a protected "public interest recognized by some legislative, administrative or judicial authority" and that at the time, the employee occupied "a position with responsibility for advancing or sustaining that particular interest." *Lord*, 748 A.2d at 401 (quotation marks omitted); *see also Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 586 (Del. Ch. 1994).

Under the first prong, DelPalazzo asserts that he has "identified numerous legislative statutes demonstrating the public policy prohibition against 'fraud, unfair and deceptive acts or practices in connection with goods or services to consumers.'" (Doc. No. 72 at p. 6 (citing Doc. No. 21 at ¶ 60[2]).) And he argues that his complaints about technicians fraudulently inflating repair costs and sales representatives giving substantial discounts implicate the public policy considerations advanced by those laws. But even assuming DelPalazzo has satisfied his burden

---

[2] DelPalazzo identifies one Delaware and one federal statute as "prohibit[ing] fraud, unfair and deceptive acts or practices in connection with goods or services to consumers." (Doc. No. 21 at ¶ 60; *see also id.* (identifying similar Pennsylvania, New Jersey, and Maryland consumer fraud statutes).) First, DelPalazzo refers to Delaware's Consumer Fraud Act, which prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation . . . with intent that others rely upon such [deception], in connection with the sale, lease or advertisement of any merchandise." 6 Del. Code Ann. § 2513(a). Second, DelPalazzo references the Federal Trade Commission Act, which states, "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." 15 U.S.C. § 45(a).

as to the first prong and shown that his complaints implicate a recognized public policy, Horizon argues that DelPalazzo cannot show that he satisfies the second prong because as a sales representative, he did not occupy a "position with responsibility for advancing or sustaining" Delaware's public interest in stopping consumer fraud. (Doc. No. 57 at p. 11.)  We agree with Horizon.[3]

The Delaware Supreme Court's opinion in *Lord v. Souder* is instructive.  748 A.2d 393 (Del. 2000).  In that case, the defendant nursing home fired the plaintiff, an administrative secretary, after she reported that her supervisor had been stealing property from deceased residents, taking money from the nursing home's petty cash drawer, and misusing nursing home resources including automobile, food, and telephone services.  *Id.* at 396–97.  The secretary challenged her dismissal, arguing that the supervisor's actions (i.e., stealing from residents) violated a Delaware statute, and she advanced the policy interests supported by that statute when she reported her supervisor's wrongdoing.  *Id.* at 401.  The Supreme Court of Delaware found this argument "not persuasive," explaining that although "[the secretary's] allegation that [her supervisor] misappropriated the property of deceased residents arguably implicates a legislatively sanctioned public interest, there is no support for the conclusion that [the plaintiff], as an administrative secretary, occupied a position with responsibility for advancing that interest." *Id.*

As with the administrative secretary in *Lord*, we are compelled to find that DelPalazzo has put forth no evidence that he had responsibility for policing other employees or otherwise

---

[3] Because we find Horizon is entitled to summary judgment on this ground, we do not address its argument that DelPalazzo's complaints to management did not implicate the relevant public policy, nor do we consider the company's argument that it never instructed its employees to commit fraud. (*See* Doc. No. 57 at pp. 7–8.)

ensuring that customers were not subject to practices that violated consumer protections laws. First, we find that no portion of the statutes identified by DelPalazzo, *see supra* n.2, explicitly gives DelPalazzo responsibility for policing or reporting consumer fraud. *Contra Lord*, 748 A.2d at 401 (finding that the fired employee "occupied a position with responsibility" for reporting nursing home abuse where the relevant statute broadly tasked all "employee[s]" of nursing homes with reporting abuse or neglect to the Department of Health and Social Services).

Second, we find that nothing in DelPalazzo's job description gave him such responsibility.[4] *See Chance v. Kraft Heinz Food Co.*, C.A. No. K18C-01-056 NEP, 2018 WL 6655670, at *13 (Del. Super. Ct. Dec. 17, 2018) ("In order to determine whether Plaintiff occupies a position with responsibility for advancing a public interest, the Court must look to the nature of Plaintiff's job functions."). As a sales representative, DelPalazzo met with customers and negotiated prices within the structure set by his superiors. (DelPalazzo Depo. at 59:21–60:19, 216:5–219:24; Koltz Decl. at ¶ 9.) DelPalazzo had no supervisory authority over any Horizon employees—meaning he had no responsibility for the discounting practices of other sales representatives, let alone responsibility for the practices of technicians, who worked in a different department. (*See* DelPalazzo Depo. at 208:1–3 ("Q: Did any people at the company report to you? A: No."); Koltz Decl. at ¶ 11; *see also* DelPalazzo Depo. at 69:3–71:5 (explaining

---

[4] DelPalazzo suggests that he cannot be considered a "[l]ow-level employee," and therefore, must be viewed as having the necessary "responsibility," because he "generated at least $30 million in revenue for Horizon, and was offered a $600,000 bonus to stay at Horizon for a period of two years." (Doc. No. 72 at p. 6.) But the fact that DelPalazzo generated substantial revenue for the company suggests, at most, that DelPalazzo did well as sales representative. It does not mean that he had responsibility for ensuring other Horizon employees complied with consumer protection laws. DelPalazzo also argues that Horizon's "emphasis upon titles"—i.e., it's argument that DelPalazzo was not labeled a "supervisor"—"is misplaced." (Doc. No. 72 at p. 9.) But again, the issue is not DelPalazzo's title, it is his job responsibilities. And as we go on to explain, those responsibilities did not include ensuring compliance with consumer protection laws.

that he and other sales representatives would meet with technicians to "give opinions and our experience in terms of talking to customers" but they "were not there to train or to . . . go over what they were supposed to do as a technician in a house")).

Nor was DelPalazzo responsible for setting the price of sales or repairs,[5] for establishing discount practices, for addressing consumer complaints related to pricing, or for monitoring the company's compliance with federal and state laws and regulations. (*See* Koltz Decl. at ¶ 11 ("As reflected in Mr. DelPalazzo's written job description, in his position as a Horizon sales representative, he was not responsible for supervision, policy, or legal compliance at Horizon concerning customer protection or fraud laws or public policies and had absolutely no supervisory or policy setting authority at Horizon."); *see also* DelPalazzo Depo. at 96:14–97:5 (discussing Yolanda Graf, who ran Horizon's call center, and explaining that "she was also in charge of concerns, so if a customer had a concern, whether they overpaid for repairs or for installation, she would handle that"); *id.* at 110:11–111:10 (explaining that he complained about being asked to sell jobs at higher prices (i.e., with less discounts) than other sales consultants, and his supervisors told him "that the concern department would handle that, so if there was a concern, that [Horizon] would have Yolanda Graf, you know, talk to the customer and work out a refund arrangement that they would pay back the homeowners"); *id.* at 157:3–14 ("[W]e were under the impression . . . that the sales manager really had final say on things with installs or sales."); *id.* at 158:18–23 ("Q: And would the managers at each location, would they be the ones

---

[5] Although DelPalazzo had some leeway when it came to offering customers discounts, the ultimate decision on pricing and discounting was with his supervisors and the owners of the company. (DelPalazzo Depo. at 58:6–59:10 ("Q: Would you agree with me that there is no firm unit pricing in the sales of HVAC residential equipment? A: I am not an owner and I don't make the prices. Owners have the right to sell it for what they want. Do I have to believe in it? No, I don't."); *id.* at 61:11–20 ("[T]hat was what was told and understood by sales consultants from their sales manager that we could do what we want within that ten percent.").)

responsible for actually implementing and carrying out the company policy. A: I would believe so, yes, I don't know 100 percent.").)

In short, DelPalazzo had no responsibility under the relevant statutes or his job position for advancing or sustaining the public's interest in preventing consumer fraud, so he cannot rely on the public policy exception to Delaware's at will employment doctrine. *See Lord*, 748 at 401; *Geary v. U.S. Steel Corp.*, 319 A.2d 174, 178–79 (Pa. 1974) ("Geary asserts in his complaint that he was acting in the best interests of the general public as well as his employer in opposing the marketing of a product which he believed to be defective. Certainly, the potential for abuse of an employer's power of dismissal is particularly serious where an employee must exercise independent, expert judgment in matters of product safety, but Geary does not hold himself out as this sort of employee. So far as the complaint shows, he was involved only in the sale of company products. There is no suggestion that he possessed any expert qualifications, or that his duties extended to making judgments in matters of product safety.").[6] *Contra Paolella*, 158 F.3d at 192 ("As the record shows, Paolella was a sales manager at the time of the allegedly unlawful billing practices and was responsible for negotiating service contracts, billing BFI's customers, and handling customer complaints. . . . [W]e believe Paolella's position as sales manager puts him in a position of responsibility sufficient to invoke [the public policy exception's] protection."); *Chance*, 2018 WL 6655670, at *15 ("Plaintiff has asserted in his Amended Complaint that he started out at Kraft Heinz as a warehouse employee and was eventually promoted to Yard Equipment Operator," and "as Yard Equipment Operator, he is a safety representative and must ensure that everything operates safely and smoothly. . . . Plaintiff could

---

[6] Delaware courts discussing the public policy exception have cited *Geary* with approval. *See Shearin*, 652 A.2d at 588; *Chance*, 2018 WL 6655670, at *14 n.104.

present evidence sufficient to prove a breach of the covenant of good faith and fair dealing, based upon the fact that he submitted an incident report and alleged unsafe conditions of the railroad ties to management.").

## V. CONCLUSION

For the reasons discussed above, summary judgment is granted in favor of Horizon on Count I of DelPalazzo's second amended complaint. An appropriate Order follows.